UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

S.K.,

      Plaintiff,

v.                    Case No: 2:17-cv-691-FtM-99MRM

LUTHERAN SERVICES FLORIDA,
INC., CHILDREN'S NETWORK OF
SOUTHWEST FLORIDA, L.L.C.,
CAMELOT COMMUNITY CARE,
INC., PEARL ARAQUE,
individually, GWENDOLYN
DOYLE, individually, and UNA
RICHARDSON, individually,

      Defendants.

_____

## OPINION AND ORDER

This matter comes before the Court on Motions to Dismiss for Failure to State a Claim filed by Defendants Children's Network of Southwest Florida, LLC (CNSF) and Camelot Community Care (CCC) (Doc. #25); Lutheran Services Florida, Inc. (LSF) (Doc. #27); Pearl Araque (Doc. #28); and Gwendolyn Doyle (Doc. #37). Plaintiff has responded to each motion (Docs. ##33, 35, 36, 40). For the reasons set forth below, the Motions are granted in part and denied in part.

**I.**

At all relevant times, plaintiff, S.K., was a minor foster child within the custody of the State of Florida. S.K. alleges that defendants failed to provide him with adequate dental care

and treatment, resulting in severe, life-long injuries. The nine-count Amended Complaint alleges both common law negligence and culpable negligence claims, as well as claims under 42 U.S.C. § 1983 for deprivation of plaintiff's Fourteenth Amendment rights to adequate medical care and reasonable safety. (Doc. #23.)

The Amended Complaint sets forth these relevant material facts: The Florida Department of Children and Families (DCF) is required by Florida statutes to provide foster care and related services to children in the custody of the State of Florida. (Doc. #23, ¶ 7.) To do so, the DCF contracts with private entities to serve as lead agencies for community-based care. Defendant Children's Network of Southwest Florida, LLC (CNSF) contracted with DCF to provide foster care and related services as the lead agency for community-based care in Lee and Charlotte Counties, Florida. (Id., ¶ 7.) The Amended Complaint describes CNSF as an "independent contractor" of the DCF. (Id., ¶ 8.) Defendant Camelot Community Care, Inc. (CCC) owns the fictitious name "Children's Network of Southwest Florida" and, "on [plaintiff's] information and belief" performed foster care and related services to children, including S.K., in Lee and Charlotte counties. (Id., ¶¶ 9, 10.)

In turn, CNSF and/or CCC subcontracted with Lutheran Services Florida, Inc. (LSF), an independent contractor of CNSF/CCC/DCF, to provide foster care and related services in Lee and Charlotte

counties.  (Id., ¶¶ 11-14.)  CNSF/CCC were required to monitor the performance of LSF.  (Id. ¶ 5.)  Defendant Pearl Araque was an employee of LSF, and was S.K.'s case manager.  (Id., ¶ 17.) Defendant Gwendolyn Doyle was an employee of LSF and was Araque's supervisor.  (Id., ¶ 18.)  Defendant Una Richardson was licensed by the entity-defendants to provide foster care services in her home, and provided foster care to S.K. from January 3, 2014 to July 30, 2014.  (Id., ¶¶ 19, 21, 49, 88.)

On or about October 28, 2013, S.K. and his twin sister were removed from their biological parents and placed in the custody of the DCF because S.K.'s serious dental needs were not being met, and his father was using S.K.'s condition to obtain prescription pain medication for himself.  (Doc. #23, ¶ 23.)  On October 29, 2013, S.K. was placed in a foster home (Id., ¶ 25), and on November 1, 2013 LSF began providing case management services to S.K.  (Id., ¶¶ 26-29.)  By November 4, 2013, all defendants except Richardson knew of S.K.'s dental status and that he needed a root canal or other procedure to address his dental pain.  (Id., ¶¶ 30-31, 34.)

On November 5, 2013, Araque performed a home visit to S.K. (Doc. #23, ¶ 35.)  During the visit, S.K. told Araque he was suffering tooth pain, but Araque but made no notation on the home visit form, even though such a notation was required by law.  (Id.) The Amended Complaint details 13 more home visits by Araque from late 2013 to early May 2014, during which S.K. consistently told

Araque he had dental pain.  Araque consistently failed to note the complaints of pain in S.K.'s records or obtain treatment for him. (Id., ¶¶ 37, 39, 41, 42, 43, 46, 52, 55, 56, 61, 65, 70, 77.)

On May 9, 2014, S.K. was seen by a dentist, who recommended a tooth extraction.  (Doc. #23, ¶¶ 72-75.)  Defendants failed to follow up (Id., ¶¶ 77, 79-83), and by July 21, 2014, S.K. was crying during the home visits and telling Araque he was in pain. (Id., ¶ 86.)  Only then did Araque note that S.K. had a tooth infection, his dental condition had deteriorated, and he was having problems in school as a result.  (Id.)

S.K. did not undergo dental surgery until on or about August 20, 2014.  (Doc. #23, ¶¶ 80, 83, 92-93.)  On August 26, 2014, S.K. was diagnosed with trigeminal neuralgia caused by the delay in his treatment, a pain disorder that affects the trigeminal nerve causing episodes of severe, sudden, and shock-like pain in one side of the face, from which he still suffers.  (Id., ¶¶ 95-96.) S.K. endured numerous procedures and suffers debilitating pain. (Id., ¶¶ 98-99.)

## II.

Under Federal Rule of Civil Procedure 8(a)(2), a Complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). This obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (citation omitted). To survive dismissal, the factual allegations must be "plausible" and "must be enough to raise a right to relief above the speculative level." <u>Id.</u> <u>See also</u> <u>Edwards v. Prime Inc.</u>, 602 F.3d 1276, 1291 (11th Cir. 2010). This requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citations omitted).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, <u>Erickson v. Pardus</u>, 551 U.S. 89 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth." <u>Mamani v. Berzain</u>, 654 F.3d 1148, 1153 (11th Cir. 2011) (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678. "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible." <u>Chaparro v. Carnival Corp.</u>, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal citations omitted). Thus, the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." <u>Iqbal</u>, 556 U.S. at 679.

**III.**

All defendants except Richardson[1] move to dismiss their respective counts in the Amended Complaint. Defendants argue that none of the counts adequately pleads actionable claims.

**A.  Claims Against CCC**

Defendant CCC is named as a defendant in Counts III (negligence), IV (culpable negligence), and VIII (§ 1983). Defendant CCC asserts that none of these counts plausibly sets forth a claim for which relief may be granted under the pleading standards summarized above. The Court agrees.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. CCC is the entity which owns the fictitious name "Children's Network of Southwest Florida." (Doc. #23, ¶ 9.) The Amended Complaint is sketchy, at best, as to CCC's actual involvement in the case, and S.K. admits that the co-defendant CNSF is a separate entity. (Doc. #33, p. 6 n. 1.) CNSF and CCC are usually lumped together with an "and/or" conjunction.

Given the amorphous nature of the allegations relating to CCC, S.K. states:

> Should discovery in this case clarify which
> entity was providing foster care and related

---

[1] Richardson filed an Answer to the Amended Complaint. (Doc. #42.)

> services to Plaintiff, S.K., and which entity
> was the lead community-based care provider in
> Lee and Charlotte Counties, Florida, Plaintiff
> will dismiss any party who played no part in
> the acts alleged, amend his allegations to
> delete such party, and would no longer need to
> use any "and/or" language and would simply use
> "and" in place of the phrase "and/or."

(Id.)  But this is not the way it works.

In the context of a complaint, plaintiff is not allowed to use such a shotgun device to haul an entity into federal court and then use discovery procedures to sort out the facts.  Fed. R. Civ. P. 11(b)(3).  Additionally, this is not pleading alternative claims as allowed by Fed. R. Civ. P. 8(d)(2); it is pleading alternative parties.  In any event, as discussed below with regard to CNSF, there are insufficient facts alleged relating to the conduct of CCC or its agents or employees to plausibly state any of the causes of action.  Accordingly, the motion is granted as to CCC, and CCC is dismissed without prejudice as to Counts III, IV, and VIII with leave to amend.

## B. Claims Against CNSF

CNSF is named as a defendant in Counts III (negligence), IV (culpable negligence), and VIII (§ 1983).  Defendant CNSF asserts that none of these counts plausibly sets forth a claim for which relief may be granted under the pleading standards summarized above.  The Court agrees for the same reasons set forth as to CCC.

The Amended Complaint alleges few facts as to conduct by CNSF

or its agents or employees that could plausibly establish the causes of action. At best, the Amended Complaint implies that CNSF is liable for the conduct of its independent contractor, LSF, and the independent contractor's employees. But a contractor such as CNSF is not liable in tort for the alleged acts or omissions of its subcontractor's employees, officers, or agents. Castello v. P'ship for Strong Families, Inc., 117 So. 3d 62, 63 (Fla. 1st DCA 2013), citing Fla. Stat. § 409.1671(1)(h). See also Fla. Stat. § 409.993(2)(a). [2] Additionally, even if liability is legally possible, there are simply insufficient facts as to the conduct of CNSF or its agents or employees to plausibly set forth the causes of actions. Accordingly, the motion is granted as to CNSF, and CNSF is dismissed without prejudice as to Counts III, IV, and VIII with leave to amend.

### C. Culpable Negligence Claim Against LSF

LSF is named as a defendant in Counts I (negligence), II (culpable negligence), and V (§ 1983). Defendant LSF asserts that Counts II and V do not plausibly set forth claims for which relief may be granted under the pleading standards summarized above. The Court disagrees as to the culpable negligence claim, and will discuss the § 1983 claim in a moment.

As to Count II, LSF argues that plaintiff has simply taken

---

[2] The Court notes that plaintiff disclaims any attempt to allege vicarious liability. (Doc. #33, p. 7.)

the conduct described in the Count I negligence claim and added the description of "culpably negligent" to LSF's alleged conduct. The reason for this, defendant surmises, is to avoid the statutory cap on damages contained in Fla. Stat. §§ 409.1671(j) (2013); 409.993(3)(a) (2014).[3] Even if this is so, the culpable negligence claim is acceptable because a plaintiff may properly plead alternative counts. Fed. R. Civ. P. 8(d)(2).

The alternative count, however, must still be sufficiently plead. Defendant defines "culpable negligence" from the criminal law context as "consciously doing an act or following a course of conduct that defendant must have known, or reasonably should have known, was likely to cause death or great bodily injury." (Doc. #27, p. 5, citing Logan v. State, 592 So. 2d 295, 298 (Fla. 5th DCA 1991)). The more applicable definition comes from the relevant statutes, which define "culpable negligence" as "reckless indifference or grossly careless disregard of human life." Fla. Stat. §§ 409.1671(1)(k); 409.993(3)(b). The Court concludes that plaintiff has satisfied his pleading burden as to Count II. The allegations in the Amended Complaint plausibly set forth a factual

---

[3] Because of the dates of the conduct involved in this case, two sets of Florida statutes are involved. From the beginning of the events in this case through June 30, 2014, Florida Statutes § 409.1671 applied. That statute was repealed effective July 1, 2014, and subsequent conduct was governed by Florida Statutes §§ 409.986–.997.

basis for a claim of culpable negligence by LSF.[4]  This portion of the motion to dismiss Count II is denied.

**D. Section 1983 Claims**

The Amended Complaint alleges § 1983 claims against LSF in Count V, against Araque in Count VI, against Doyle in Count VII, and against CNSF/CCC in Count VIII.  These § 1983 claims provide the only bases for federal court jurisdiction.

Title 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

In sum, "[t]o establish a claim under § 1983, a plaintiff must demonstrate that a person acting under color of state law deprived him of a federal right." Bailey v. Wheeler, 843 F.3d 473, 480 (11th Cir. 2016).  All defendants move to dismiss their respective § 1983 claims for various reasons.

---

[4] It is not clear that there is a cause of action for negligence, given that the statutes limit liability to culpable negligence and make this the exclusive basis for liability.  Fla. Stat. §§ 409.1671(1)(k) (2013); 409.993(3)(b) (2014).  The Court, however, is not presented with that issue in any of these motions.

### (1)  "Persons" Within the Meaning of § 1983

As § 1983 states, in order to incur liability a defendant must be a "person."  All § 1983 defendants seek to dismiss the § 1983 claims because they are not "persons" within the meaning of § 1983, but rather are "arms" of the State of Florida.  The Amended Complaint specifically pleads that each of the entity defendants is a "person" (Doc. #23, ¶¶ 127, 162) and that all defendants were not a "state agency" within the meaning of Fla. Stat. § 768.28. (Id., ¶ 16.)  Plaintiff argues that none of these defendants are an arm of the State, and therefore are "persons" within the meaning of § 1983.  Alternatively, plaintiff asserts that Florida has waived defendants' immunity from suit.  (Doc. #33, p. 12, n.6.)

Defendants base their argument on Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989), in which the United States Supreme Court held that a State is not a "person" within the meaning of Section 1983.  "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.  The Eleventh Amendment bars such suits unless the State has waived its immunity."  Id. at 66.  Will noted that the holding "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes."  Id. at 70.

In Florida, the obligation to provide foster care when a child is involuntarily removed from the parents is on the State, acting through DCF. The DCF is undoubtedly a state agency, and is not a "person" subject to suit under 42 U.S.C. § 1983.[5] Hence, the DCF has not been named as a § 1983 defendant in this case.

But the decision in _Will_ "applies only to States or **governmental** entities that are considered 'arms of the State' for Eleventh Amendment purposes." _Will_, 491 U.S. at 70 (emphasis added). It is apparent that none of the § 1983 defendants are the State of Florida or a governmental entity. Thus, none of the § 1983 defendants can come within the literal requirements of _Will_.

Defendants argue, however, that a private entity may be considered an "arm of the State" if it satisfies the same Eleventh Amendment standards used to determine whether a governmental entity is an "arm of the State." The Supreme Court has not addressed the question of whether a private entity can be an "arm of the State" in this context. The Eleventh Circuit on one occasion found that a private entity was an arm of the State under the Eleventh Amendment, _Shands Teaching Hosp. & Clinics, Inc. v._

---

[5] The DCF is the re-designation of the Florida Department of Health and Rehabilitative Services, and agency of the State of Florida. _Doe, 1-13 ex rel Doe Sr. 1-13 v. Bush_, 261 F.3d 1037, 1042 n.2 (11th Cir. 2001). The Eleventh Circuit has held that the Florida Department of Health and Rehabilitative Services is immune under the Eleventh Amendment. _Gamble v. Florida Dep't of Health and Rehabilitative Servs._, 779 F.2d 1509 (11th Cir. 1986).

<u>Beech St. Corp.</u>, 208 F.3d 1308 (11th Cir. 2000), but that case applied a test which has since been abrogated. <u>See</u> <u>Lake v.</u> <u>Shelton</u>, 840 F.3d 1334, 1337 (11th Cir. 2016). Additionally, in the context of determining whether a private entity was a "state actor" under § 1983, the Eleventh Circuit stated: "When a private entity like PHS contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state. In so doing, it becomes the functional equivalent of the municipality." <u>Buckner v. Toro</u>, 116 F.3d 450, 452 (11th Cir. 1997).

For purposes of this motion only, the Court assumes that it is possible for a private entity to be an arm of the State under the Eleventh Amendment, and therefore not be a "person" within the meaning of § 1983. The question therefore becomes whether plaintiff has plausibly pled that the private contractor CNSF/CCC and the private subcontractor LSF are "persons" within the meaning of § 1983. As discussed later, the Court further finds that it is not possible for an employee of a private entity sued in his or her individual capacity to be an arm of the State.

"Whether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." <u>Manders v. Lee</u>, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc). The specific function at issue in this case is

providing medical care, specifically dental care, to a foster child who has become the responsibility of the State of Florida. Whether a defendant is an "arm of the State" requires an analysis of: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Id. at 1309. It is defendants' burden to show that the Manders factors weigh in their favor. Miller v. Advantage Behavioral Health Sys., 677 F. App'x 556, 559 (11th Cir. 2017).

First, some background. At all relevant times, the State of Florida has "traditionally provided foster care services to children who have been the responsibility of the state." Fla. Stat. §§ 409.1671(c)1; 409.993(1)(a). As the Amended Complaint phrases it: "At all times material hereto, pursuant to Chapter 409, Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida." (Doc. #23, ¶ 163.)

Despite this tradition, the Florida Legislature determined that "outsourcing" was needed for foster care and related services, which remained "of paramount importance to the state." Fla. Stat. §§ 409.1671(c)1; 409.993(1)(a). Beginning in January, 2000, the Florida Legislature decided that DCF would phase-in a plan to "outsource" the provision of foster care and related services on

a statewide basis, Fla. Stat. § 409.1671(1)(a), and continue to work towards full outsourcing. Fla. Stat. § 409.1671(1)(b).

"Outsource" was defined as "to contract with competent, community-based agencies," Fla. Stat. § 409.1671(1)(a), who satisfied certain requirements, Fla. Stat. § 409.1671(1)(e). It remains the intent of the Florida Legislature that the DCF provide child protection and welfare services "through contracting with community-based care lead agencies." Fla. Stat. § 409.986(1)(a). The DCF was initially authorized, Fla. Stat. § 409.1671(2)(a) (the department "may" contract), and is now required, Fla. Stat. § 409.996 (the department "shall" contract), to contract for the "delivery, administration, or management" of foster care services. Despite this contractual outsourcing, "[t]he department shall retain responsibility for the quality of contracted services and programs and shall ensure that services are delivered in accordance with applicable federal and state statutes and regulations." Fla. Stat. § 409.1671(1)(a). See also Fla. Stat. § 409.996. As the Florida Legislature more recently stated:

> The Legislature further finds that the appropriate care of children is ultimately the responsibility of the state and that outsourcing such care does not relieve the state of its responsibility to ensure that appropriate care is provided.

Fla. Stat. § 409.986(1)(b). The DCF procures a "community-based care lead agency" ("lead agency" for short) through competitive

bidding, Fla. Stat. § 409.987(1), and must obtain a five-year contract with the lead agency.  Fla. Stat. § 409.987(3).

### (a)  Entity Defendants:

### (1)  How State Law Defines the Entities

The first factor focuses on how Florida law defines a lead community-based agency and a subcontractor of such an agency. While federal law governs whether an entity falls within the Eleventh Amendment, the manner in which state law treats the entity guides the analysis.  Lightfoot v. Henry Cnty. Sch. Dist., 771 F.3d 764, 769-71 (11th Cir. 2014).

Florida outsources foster care and related services to a "lead agency," which is defined as "a single entity with which the department [of children and families] has a contract for the provision of care for children in the child protection and child welfare system in a community that is no smaller than a county and no larger than two contiguous judicial circuits."  Fla. Stat. § 409.986(3)(d).  See also Fla. Stat. § 409.1671(1)(e).  The lead agency must "[b]e organized as a Florida corporation or a governmental entity," Fla. Stat. § 409.987(4)(a), be governed by a board of directors, Fla. Stat. § 409.987(4)(b), and demonstrate financial responsibility through regular fiscal audits and the posting of a performance bond, Fla. Stat. § 409.987(4)(c).  While the lead agency may subcontract for the provision of the services required by its contract with the DCF, Fla. Stat. § 409.988(j),

there are no particular statutory definitions of or requirements for such subcontractors other than a requirement to maintain insurance if the subcontractor is a direct provider of services. Fla. Stat. § 409.1671(j).

The statutes refer to the entities as "private" or "non-governmental." The statutes require that "private providers" maintain liability insurance, referring to the entities as "nongovernmental ... providers." Fla. Stat. §§ 409.1671(f)(1); 409.993(1)(a). The statute refers to the outsourced projects as "privatized services." Fla. Stat. § 409.1671(4)(a). The "private nonprofit agency" is authorized to act as a child's guardian and seek certain emergency medical attention. Fla. Stat. § 409.1671(1)(a). Further, the reason for the extensive controls discussed below is precisely because the lead agency remains a "private entity" performing an important state function. Fla. Stat. § 409.986(1)(b).

The Florida Legislature knows how to phrase a statute to include a private business entity within the meaning of a state "agency." See Econ. Dev. Com'n v. Ellis, 178 So. 3d 118, 119 (Fla. 5th DCA 2015) (noting that Florida's Public Records Act makes it the "duty of each agency" to provide access to public records, Fla. Stat. § 119.01, and that the Act defines "agency" to include any private business entity "acting on behalf of any public agency." Fla. Stat. § 119.011(2)). No such expansive definition

was included with regard to a lead agency or a subcontractor providing foster child care or related services.

The Court finds nothing about the way Florida defines a lead agency or subcontractor which suggests that Florida law views either of the entities as an arm of the State. A lead agency which is not already a government entity need be little more than a Florida corporation with a board of directors and a performance bond. Few special requirements exist by statute as to a subcontractor. The first factor weighs against finding that any of the entities are an arm of the State of Florida.

### (2) Degree of Control the State Maintains Over the Entities

The second factor examines the degree of control Florida maintains over the activity from which defendants' alleged liability arises. The question is whether Florida exercises meaningful control over a lead agency's and its subcontractor's provision of health care (in this case dental care) to a foster child. While Florida exercises a high degree of control over the lead agency, and indirectly, a high degree of control over a subcontractor, it is not sufficient to weigh in favor of the entities being considered an arm of the State.

The Florida Legislature has found that "when private entities assume responsibility for the care of children in the protection and child welfare system, comprehensive oversight of the

programmatic, administrative, and fiscal operation of those entities is essential." Fla. Stat. § 409.986(1)(b). This "comprehensive oversight" of a lead agency includes the following:

- Required compliance with certain statutory directives concerning the composition and powers of its board of directors, Fla. Stat. § 409.987(4)(a);

- Required demonstration of financial responsibility through an organized plan, Fla. Stat §§ 409.987(4)(c);

- Required production of "information necessary for oversight by the department [of children and families] to the child welfare results-oriented accountability system required by s. 409.997," Fla. Stat. § 409.988(1)(b);

- Required posting of certain information on the entity's website, including the budget and other financial information, Fla. Stat. § 409.988(1)(d), and specified other information on a monthly basis, Fla. Stat. § 409.988(1)(k);

- Required compliance with financial guidelines developed by the DCF, Fla. Stat. § 409.988(1)(c);

- Required ensurance of proper training and the satisfaction of DCF's minimum employment standards. Fla. Stat. § 409.988(1)(f);

- Required maintenance of eligibility to receive all available federal child welfare funds, Fla. Stat. § 409.988(1)(g);

- Required compliance with federal and state statutory requirements and agency rules, Fla. Stat. §§ 409.988(1)(i), 409.1671(5)(a);

- Required possession of an appropriate licensed from the FDC, Fla. Stat. § 409.988(2)(a);

- Required submission to graduated penalties if an agency does not comply with the contract terms, Fla. Stat. § 409.996(1)(b);

- Required annual evaluation by DCF, Fla. Stat. § 409.996(18)(a).

- Required maintenance of liability insurance for nongovernmental providers, Fla. Stat. § 409.993(2)(a).

- Required procurement of commodities or contractual services in compliance with "the financial guidelines developed by the department," Fla. Stat. § 409.992(1).

- Mandatory allowance of certain types of expenditures and disallowance of other types, Fla. Stat. § 409.992(2).

- Required limitation on the portion of the salary of an administrative employee paid by the State, which is capped at a certain percentage of the annual salary of the secretary of the DCF, Fla. Stat. § 409.992(3).

None of these statutory requirements applies directly to subcontractor providers.

The State also requires the DCF to monitor the contracts pursuant to written policies and procedures that address, among other things, program operations including provider achievement of performance standards, monitoring of subcontractors, and follow-up of corrective actions. Fla. Stat. § 409.1671(2)(a). The DCF is required to establish a quality assurance program for the privatized providers, and perform an annual evaluation. Fla. Stat. § 409.1671(4)(a). The statute also assumes the entities may engage in unrelated work. Fla. Stat. § 409.1671(i), (k). At this stage of the proceedings, we know little about the day-to-day

operation of the entities in the performance of the contracts, or any actual exercise of control of such operations by the DCF.

Florida undoubtedly exercises a high degree of control over the lead agency, and indirectly, a high degree of control over a subcontractor.  It appears that Florida may also exercise meaningful control over the entities' provision of health care to a foster child.  At this stage of the proceedings, the record has not been sufficiently developed to support a finding that the degree of control weighs in favor of the entities being considered an arm of the State.

### (3)  Where the Entities Derive Funds

The third factor considers where the entity derives its funds. The Court focus primarily on the quantum of funding the State provides to the entity and, where relevant, the level of control the State exercises over the entity's funding structure, budget, and overall financial autonomy.  <u>Miller</u>, 677 F. App'x at 563 (citations omitted).

It appears that the primary source of funding for the entities is the State of Florida, although other sources of funding are contemplated.  "A contract established between the department and a lead agency must be funded by a grant of general revenue, other applicable state funds, or applicable federal funding sources." Fla. Stat. § 409.990.  Additionally, "[e]ach contract with a lead agency shall provide for the payment by the department to the lead

agency of a reasonable administrative cost in addition to funding for the provision of services." Fla. Stat. § 409.990(4). Unexpended state funds in excess of a certain percentage must be returned to the DCF. Fla. Stat. § 409.990(5). The method by which the State allocates funds to the agencies is set forth in Section 409.991. A county, municipality, or special district can voluntarily fund foster care and related services. Fla. Stat. § 409.1671(1)(a). Additionally, community-based agencies are encouraged to raise their own funds, which may be matched by the State. Fla. Stat. § 409.990(6).

At this stage of the proceedings, the record shows little about the amounts of funding during the relevant time period, the amounts from other sources, and the proportion of state funding for each entity. The Court cannot conclude that this factor weighs in favor of the entities being considered an arm of the State.

### (4) Liability and Payment of Adverse Judgments

The fourth factor is "whether the State would bear ultimate responsibility for an adverse judgment." Lightfoot, 771 F.3d at 777. The focus is on "potential legal liability and the risk of adverse judgments, as opposed to requiring that state funds actually pay the judgment." Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430-31 (1997). "[I]t is the entity's potential legal liability, rather than its ability or inability to require

a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." Id. at 431.

Florida law requires private entities treated as non-state agencies to maintain liability insurance. "[I]nsurance needs to be available and remain available to nongovernmental foster care and related services providers . . . ." Fla. Stat. § 409.993(2)(a). See also Fla. Stat. §§ 409.1671(h); 409.1671(j). The remedy provided by this statute is the only basis for liability. Fla. Stat. §§ 409.1671(1)(k); 409.993(b). The statutes impose damages caps on tort suits brought against the entities, id., and allows a plaintiff to pursue a claim bill with the Legislature to obtain any excess judgment. Fla. Stat. §§ 409.1671(h); 409.993(2)(a). "[A] claims bill is a 'voluntary recognition of its moral obligation by the legislature.'" Searcy, Denney, Scarola, Barnhart & Shipley, etc. v. State, 209 So. 3d 1181, 1189 (Fla. 2017). "[T]he decision whether or not to pass a claims bill and pay any or all of a claim is entirely a legislative function completely independent of judicial intervention." State, Dept. of Envtl. Prot. v. Garcia, 99 So. 3d 539, 545 (Fla. 3d DCA 2011). This has been described as an "arduous" legislative process. City of Miami v. Valdez, 847 So. 2d 1005, 1006–7 (Fla. 3d DCA 2003).

The Court concludes that this does not weigh in favor of the entities being an arm of the State. Any damages award against the

entities are capped by statute, are the exclusive basis for liability, and have no possibility of coming from the State coffers unless the State agrees.

In sum, the Court concludes that at this stage of the proceedings defendants have not shown that any of the entity defendants are an arm of the state. Plaintiff has sufficiently plead that these defendants are "persons" within the meaning of § 1983. The motion to dismiss on this basis is therefore denied.

### (b) Individual Defendants

As for the LSF employees sued in their individual capacities, there is no possibility that they can be an arm of the State because the very nature of the individual capacity suit negates such a possibility. An individual-capacity § 1983 claim seeks to impose personal liability upon the official for actions taken under color of state law which caused the deprivation of a federal right. Kentucky v. Graham, 473 U.S. 159, 165 (1985). Any award of damages against an official in his personal capacity can be satisfied only from the official's personal assets. Id. Thus, defendants sued in their personal capacity are not in privity with their employer. Konikov v. Orange County, Fla., 276 F. App'x 916, 918 (11th Cir. 2008). See also Lewis v. Clarke, 137 S. Ct. 1285, 1288 (2017)(in suit brought against tribal employee in individual capacity, the employee is real party in interest and the tribe's sovereign immunity is not implicated); Hafer v. Melo, 502 U.S. 21, 30–31

(1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983."); Hobbs v. Roberts, 999 F.2d 1526, 1528 (11th Cir. 1993) (noting that Eleventh Amendment immunity does not extend to " 'individual' or 'personal' capacity suits in federal court"); Gamble v. Fla. Dep't of Health & Rehabilitative Servs., 779 F.2d 1509, 1512-13 (11th Cir. 1986) ("[T]he Eleventh Amendment provides no bar to federal court adjudication of suits against state officers individually."). The individual defendants' motion to dismiss on this ground is denied.

### (2) Failure to Properly Allege Deliberate Indifference

All § 1983 defendants argue that the Amended Complaint fails to set forth sufficient facts to allege deliberate indifference to plaintiff's constitutional rights. The constitutional rights at issue in all of the § 1983 counts are plaintiff's rights under the Fourteenth Amendment to proper medical treatment, including dental treatment, and to not be exposed to unreasonable risk of harm and physical deterioration.

There is no dispute that a foster child in the care of the state has constitutional rights to proper medical treatment and to reasonable safety.

> It is clearly established in this circuit that foster children have a constitutional right to be free from unnecessary pain and a fundamental right to physical safety. Taylor v. Ledbetter, 818 F.2d 791, 794-95 (11th

> Cir.1987) (en banc). The state's action in assuming the responsibility of finding and keeping the child in a safe environment places an obligation on state officials to ensure the continuing safety of that environment. <u>Id.</u> The failure to meet that obligation constitutes a deprivation of liberty under the fourteenth amendment. <u>Id.</u>

<u>Ray v. Foltz</u>, 370 F.3d 1079, 1082 (11th Cir. 2004). However, defendants are not subject to § 1983 liability unless they were deliberately indifferent to plaintiff's right to proper medical care and reasonably safety. <u>Taylor v. Ledbetter</u>, 818 F.2d at 797. "Only where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child will liability be imposed." <u>Id.</u>

Deliberate indifference is not the same thing as negligence or carelessness. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). A state official acts with deliberate indifference only when the official disregards a risk of harm of which he or she is actually aware. <u>Farmer v. Brennan</u>, 511 U.S. 825, 836 (1994). In order to establish deliberate indifference, plaintiffs must allege (and prove at trial) that the defendant: (1) was objectively aware of a risk of serious harm; (2) recklessly disregarded the risk of harm; and (3) this conduct was more than merely negligent. <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999).

As discussed above in the context of the culpable negligence claim, the Court has found that the allegations in the Amended

Complaint plausibly set forth a factual basis for a claim of culpable negligence by LSF, defined as "reckless indifference or grossly careless disregard of human life." Fla. Stat. §§ 409.1671(1)(k); 409.993(3)(b). This definition is similar to the allegations required for deliberate indifference. The Court concludes plaintiff has adequately plead deliberate by LSF, and the motion to dismiss on this basis is denied. However, the Court does not find that plaintiff plausibly alleges deliberate indifference as to CNSF/CCC. As discussed above, there are simply insufficient facts as to the conduct of CNSF or its agents or employees to plausibly allege that the entities were deliberately indifferent.

As to the individual defendants, construed liberally, plaintiff claims that Araque and Doyle were deliberately indifferent to S.K.'s serious dental needs and/or deliberately failed to learn of S.K.'s serious dental needs by delaying his treatment when they were aware of his condition through numerous home visits as well as doctor reports. Plaintiff alleges that Araque and Doyle knew he was suffering from excruciating pain because he informed them on the visits, but they failed to act. As such, the Court finds that plaintiff has pled facts that, taken as true, sufficiently allege a claim for deliberate indifference against the individual defendants.

### (3)  Failure to Properly Allege Policy or Custom

The entity defendants argue that even if the Amended Complaint properly alleges that the private entity is a "person," and properly alleges deliberate indifference, § 1983 still requires plausible allegations of a policy or custom which was the moving force behind the injury (Counts V, VIII).  These defendants assert that the Amended Complaint fails to allege sufficient facts to allege such a custom or policy by the entities.

When plaintiff brings a § 1983 claim against a private entity under contract with the State, plaintiff must allege that the violation of rights was the result of an official policy or custom. Buckner v. Toro, 116 F.3d 450, 453 (11th Cir. 1997); German v. Broward Cnty. Sheriff's Office, 315 F. App'x 773, 776 (11th Cir. 2009).  Plaintiff must identify the policy or custom which caused his injury so that liability will not be based upon an isolated incident, McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004) (citations omitted), and the policy or custom must be the moving force of the constitutional violation.  Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1330 (11th Cir. 2003).  See also Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the [entity]."  Cooper v. Dillon, 403 F.3d

1208, 1221 (11th Cir. 2005) (quoting Sewell v. Town of Lake
Hamilton, 117 F.3d 488, 489 (11th Cir. 1997)).  A custom is
established by showing a persistent or widespread practice and an
entity's actual or constructive knowledge of such customs, though
the custom need not receive formal approval.  Depew v. City of St.
Marys, 787 F.2d 1496, 1499 (11th Cir. 1986).  "Normally random
acts or isolated incidents are insufficient to establish a custom
or policy."  Id.

     In the "General Allegations" section of the Amended
Complaint, plaintiff alleges that throughout the relevant time
period, LSF, CNSF, and/or[6] CCC were aware that numerous foster
children in the population they served were overdue for dental
examinations and were not receiving medically necessary dental
treatment, causing them to be at a substantial risk of dental harm.
See Doc. #23, ¶ 20 (May 15, 2012 – 102 children); ¶ 24 (Oct. 22,
2013 – 77 children); ¶ 53 (Jan. 26, 2014 – 115 children); ¶ 57
(Feb. 26, 2014 – 116 children); ¶ 78 (May 18, 2014 – 66 children);
¶ 84 (June 16, 2014 – 60 children); ¶ 89 (Aug. 10, 2014 – 73
children).  Plaintiff also specifically alleges that on or about
November 17, 2013 LSF was aware that numerous children were overdue
for dental exams, the number was increasing, causing children to
be at substantial risk of dental harm.  (Id., ¶ 38.)  Plaintiff

_____

        [6] Dismissal for pleading alternative parties was discussed
above, which plaintiff has been directed to amend.

also alleges that CNSF, and/or CCC were aware that LSF had failed to provide dental assessments for a number of foster children under their care, and failed to provide follow up care. (Id., ¶¶ 32, 33.) Plaintiff alleges "upon information and belief" that on or about March 12, 2014, the DCF question CNSF and/or CCC regarding the excessive number of children with overdue dental services and required action. (Id., ¶ 62.)

Under Counts V and VIII, plaintiff claims that S.K.'s constitutional rights were violated due to the following official acts and/or customs of LSF, CNSF, and/or CCC, which were persistent and widespread:

- Failing to provide dental screenings and examinations to assess for serious dental needs for children in its care, including S.K.;

- Failing to ensure that children in its care, including S.K., were provided with recommended and necessary dental treatment in accordance with professional judgment.

- Failing to take emergency corrective action to ensure that all children in its custody, including S.K., had timely dental examinations to prevent dental conditions from deteriorating;

- Failing to take emergency corrective action to ensure that all children in its custody, including S.K. had timely dental treatment to prevent dental conditions from deteriorating;

- Failing to ensure provision of dental services to children in its custody, including S.K., who had identified, known dental conditions and treatment needs; and

- Failing to take emergency corrective action to ensure that supervisory reviews were performed for all children in its custody, including S.K., in a qualitative manner with appropriate directives given to case managers to ensure that

appropriate medical and dental services were provided to such children.

(Doc. #23, ¶¶ 130, 165.)  Plaintiff alleges that the entity defendants had knowledge of the policies and/or customs described above.  (Id., ¶¶ 131, 166.)

The entity defendants argue that plaintiff fails to include allegations grounded in fact to show that any children were harmed; rather, all plaintiff has provided is a list that is conclusory in nature, and does not cite any prior instances of alleged misconduct or any specific examples of the persistent and widespread practices.  (Doc. #25, p. 14; Doc. #27, pp. 14-15.)

Contrary to the entity defendant's assertions, the Court finds that plaintiff has sufficiently alleged a policy or custom that was the moving force behind the failure to provide plaintiff and other foster children with adequate dental care.  Plaintiff has alleged more than mere isolated incidents as plaintiff states in detail numerous instances where foster children were overdue for dental examinations and put at risk of dental harm (Doc. #23, ¶¶ 20, 24, 32, 33, 38, 53, 57, 78, 84, 89), and those allegations are incorporated by reference into Counts V and VIII (Id., ¶¶ 125, 160).  Taking these allegations as true, the Court concludes that S.K. has adequately pled a § 1983 claim against the entity defendants for violating S.K.'s constitutional rights to proper

medical treatment and reasonable safety via an official custom or policy.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1.    Defendants Children's Network of Southwest Florida, LLC and Camelot Community Care, Inc.'s Motion to Dismiss (Doc. #25) is **GRANTED IN PART AND DENIED IN PART**.   Counts III, IV and VIII are dismissed without prejudice to plaintiff filing a Second Amended Complaint within **thirty (30) days** of this Opinion and Order.

2.    Defendant Lutheran Services Florida, Inc. Motion to Dismiss (Doc. #27) is **DENIED**

3.    Pearl Araque's Motion to Dismiss (Doc. #28) is **DENIED.**

4.    Gwendolyn Doyle's Motions to Dismiss (Doc. #37) is **DENIED**.

5.    A second amended complaint, if filed, shall set forth all causes of actions against all defendants in a single document, including the defendant who has already answered.

**DONE and ORDERED** at Fort Myers, Florida, this __7th__ day of May, 2018.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record